JUDGMENT ACCORDINGLY.

THE other judges concur.

---

SOUTH OMAHA LUMBER CO., APPELLEE, v. THE CENTRAL INVESTMENT CO. ET AL., APPELLANTS.

[FILED JULY 2, 1891.]

1. **Mechanics' Liens**: ESTOPPEL TO DENY TITLE. In an action by the S. O. L. Co. to foreclose a mechanic's lien upon a lot, therein described, against M. S. L. and E. A. L., in the petition it was alleged that at the date of the lien (June 5, 1888), M. S. L. and E. A. L. were the owners of said lot in fee simple. M.

36

S. L. and E. A. L. answered by a general denial. Afterwards, the C. I. Co. presented a petition alleging that M. S. L. and E. A. L. sold and conveyed to said C. I. Co., on July 1, 1889, all their right, title, and interest in and to said lot, and praying to be permitted to defend the action under the answer filed by M. S. L. and E. A. L., which was granted. A decree being rendered for the plaintiff, on appeal by the C. I. Co., *held*, that it was estopped to deny either its own title or the title of M. S. L. and E. A. L. in the said lot.

2. **The evidence** examined, and *held*, to sustain the verdict.

. APPEAL from the district court for Douglas county. Heard below before WAKELEY, J.

*McGilton & Stoddart*, for appellant, the Central Investment Co.

*Bartlett, Baldridge, Ledwich & Crane, contra.* .

COBB, CH. J.

The petition alleges that the plaintiff is a company formed for doing business in Nebraska, and that on the — day of June, 1888, it entered into an oral contract with Milon S. Lindsay, one of the defendants, through Francis Jondro, his duly authorized agent, to furnish to him, the said Lindsay, certain lumber and building material, situated on the north forty feet of the west seventy-five feet of lot 7, block 81, in the city of South Omaha; that in pursuance of said contract the plaintiff furnished the said lumber and building material contracted for, for the purpose of erecting said building, and delivered the same on and between the 5th day of June, 1888, and the 8th day of August, inclusive; that the items of said lumber and building material contracted for and delivered at said building, with the cost thereof, are set out and appear on the bill of particulars and accounts annexed to the said petition; that the total value of said lumber and building material aggregated the sum of $546.15, on

which a credit of $24.33 had been given, leaving the
amount of $521.81 yet due and unpaid on said account;
that the defendant, Milon S. Lindsay, at the time the plaint-
iff furnished said lumber and building material, was the
owner in fee of said premises, and his wife, Emma A.
Lindsay, had a dower interest therein ; that on the 8th day
of September, 1888, and within four months from the time
of furnishing said lumber and building material, the
plaintiff made an account in writing of the items of said
lumber and building material furnished under said con-
tract, and after making oath thereto as required by law,
filed the same in the office of the register of deeds in and
for Douglas county, claiming a mechanic's lien therefor
upon said lot and building thereon; that the sum of
$521.81, with interest from the 8th day of August, 1888,
then remained due and unpaid on said account; with
prayer for judgment against said defendants for the sum
of $521.81 with interest from August 8, 1888, and costs
of suit, and that said premises be sold and the proceeds
thereof applied to the payment of said judgment, interest,
and costs, and for general relief.

The defendants made and filed a joint answer to said
petition, consisting of a general denial. On the 19th
of November, 1889, the Central Investment Company
made and filed its petition in said action, in which it
alleged that the above named Milon S. Lindsay and E. A.
Lindsay sold and conveyed to said Central Investment
Company on July 1, 1889, all their right, title, and inter-
est in and to said real estate, and praying that it may be
substituted as defendant in said action, and be permitted to
defend the same under the answer filed therein by the said
Milon S. Lindsay and Emma A. Lindsay. And after-
wards, on the 19th day of November, 1889, said invest-
ment company filed a stipulation in said court signed by
the parties, plaintiff and defendant, by their several attor-
neys, whereby it was agreed by and between the said par-

532          NEBRASKA REPORTS.          [Vol. 32

South Omaha Lumber Co. v. Central Invest. Co.

ties plaintiff and defendant that the said Central Invest-
ment Company be made a party defendant in the above
action. And afterwards, on the same day, it was ordered
by the said court that the Central Investment Company be,
and thereby was, made additional party defendant therein.
And on the same day the said Central Investment Com-
pany made appearance in said action by William E.
Healey, its attorney; waived the issuance and service of
summons and made its voluntary appearance therein, and
afterwards, on the 28th day of December, 1889, the said
cause was tried to the court and a decree entered therein
for the plaintiff. The cause is brought to this court by
appeal.

Upon the trial E. C. Dennet was sworn as a witness for
plaintiff, and testified that he was in the lumber business at
South Omaha; that he was the proprietor of the South
Omaha Lumber Co., plaintiff in this case; that he sold to
Mr. Jondro, who claimed to be acting as Mr. Lindsay's
agent, a bill of lumber; that Mr. Jondro came to witness's
office sometime early in June, 1888, with a plasterer whose
name is Norton—witness did not know his first name; they
brought an estimate and asked for "our prices; I figured
the bill and made a price of $300, and they instructed me
to send the lumber down, that is, Mr. Jondro did." Wit-
ness stated that he had forgotten the description of the lot
to which they directed him to send the lumber; that in
pursuance of that conversation he delivered the bill of
lumber that was figured on with a few exceptions, which
witness stated were in as credits on the bill; also some ad-
ditional lumber that was ordered by Mr. Jondro. Witness
here presented a bill of lumber which was received and
appears in the bill of exceptions. Upon objection being
made to said bill, the court inquired of counsel for the
plaintiff whether he proposed to follow this with proof that
this man Jondro was the agent of Lindsay, to which counsel
answered that he did. Witness continued that the lumber

was furnished for the purpose of going into the construction "of this building on this lot." Upon being asked to designate the lot as lot 7 in block 81, South Omaha, witness answered, "I can't recollect the exact description now except as from the notation that we made at the time; that in answer to last question he would say that at the time this contract was made for the delivery of this lumber, Mr. Jondro handed to witness the estimate which he had spoken of and stated that it was to raise, alter, repair, and change a building on this lot; that he couldn't make an accurate and correct bill covering all the lumber he would need but this would cover a considerable portion of it; that they would need additional quantities of lumber, which he would order from time to time as he saw what was required to complete the work. He stated that Mr. Lindsay had engaged him to oversee and do the necessary carpenter work." That within four months he filed a lien for this lumber. Witness here identified the lien, which was offered in evidence and appears in the bill of exceptions.

F. Jondro was sworn as a witness on the part of the plaintiff. He stated that about the first day of May—May or June—Lindsay told witness he wanted a basement put in there to set the old building on. He says: "Get the lumber and get that ready, so we can have it to put the old building on." That in pursuance of that conversation witness sought to purchase the lumber from the lumber companies; went to the South Omaha Lumber Co.; that there was no one with him when he ordered the first lumber bill for the basement; that the South Omaha Lumber Co. gave him figures for the bill which he presented; that he bought this lumber from the South Omaha Lumber Co. in pursuance of the instructions he had from Mr. Lindsay. "He told me to get the lumber whenever I wished, and I got it of the South Omaha Lumber Co." That the second time he ordered lumber Mr. Norton was with him; that the lumber which he ordered the first time was for the base-

ment to set the old building on, the other lumber that he ordered was to inclose it—the outside. The following is this witness's testimony in relation to the delivery of the lumber:

Q. Do you know whether or not the lumber which you purchased was delivered at the lot upon which this building of Mr. Lindsay's was being built?

A. Yes, sir, it was.

Q. Do you know whether the exact amount of lumber which you ordered was delivered there?

A. I suppose it was, because we signed the tickets there as they come in, and it was all used up.

Q. Look over those tickets (witness handed a bunch of tickets), and say whether those are your signatures and whether they were signed by you or under your direction.

A. Yes, sir, they were signed by me in part, and others by my direction. There were a few signed by parties when I wasn't there.

Q. Do you know whether or not the lumber as indicated by these tickets was delivered at the ground?

A. Yes, sir, I do.

The bunch of lumber tickets identified by witness were introduced in evidence, and appear on the bill of exceptions.

Q. What is the amount of the bill?

A. I do not know the amount exactly.

Q. Tell the court whether or not Mr. Lindsay ever paid through you any bills which you had contracted in the construction of this building?

A. Yes, sir.

Q. What bills did he pay?

A. Hardware bill.

Q. What was that hardware used for?

A. Used there for this house—nails, locks, hinges, etc.

Q. In the construction of this same building?

A. Yes, sir.

Q. Did he pay any other bills which you had contracted?

A. He gave me $50 and I paid it out to the men.

Q. Did he give it to you yourself, or to be paid out to men working on the building?

A. To be paid out to the men. I had paid some out of my own, and there was more to be paid out.

D. H. Howland, sworn on the part of the plaintiff, testified that he is engaged in the lumber business, and has been for about four years. When asked to examine the bill of lumber above introduced and state as an expert whether the prices at the time that lumber was delivered, as stated there in the account, were prices that were reasonable and just for that quantity of lumber, he answered that he thought they were reasonable for that amount and quality of lumber, and thinks it a fair market value of lumber at the time it was delivered, as shown on the bill.

R. W. Clayton was sworn as a witness on the part of the plaintiff. Testified that he is engaged in the lumber business and had been for five years; was acquainted with the prices of lumber between the 5th day of June and the 8th day of August, 1888; that he had looked at the said bill and considered the prices reasonable.

E. C. Dennet, being recalled, upon being requested to look at the said bill and inform the court what amount is due thereon, answered: "The bill as rendered with the credits for some lumber that was returned is $521.81—correct bill." To the question, "Has any amount been paid on that bill?" he answered: "No, sir, none whatever." To the court he answered, "The first lumber was delivered June 5, 1888, and August 8, 1888, I think was the last." He also, in answer to the question which was objected to and the objection overruled, said: "The large bill—the itemized bill—as rendered and forming part of that lien, comprises the items on these tickets, and there is nothing on the large bill but what is found on the re-

ceipted tickets. If there is anything we are willing to eliminate and throw it out as incorrect."

The witness E. C. Dennett, being the second time re-called, testified that Mr. Norton was present when this lumber was ordered; that they (Norton and Jondro) handed witness the original bill, on which witness put a price of $300. After some consultation between Jondro and Norton, witness heard Mr. Norton say that "as this firm gave us the lowest price we had better buy the lumber here," and in a few minutes the lumber was ordered, and they directed witness's company to send it down to the place where it was to be used.

By the court: Were any directions given as to whom you should charge this lumber?

A. To charge it to Mr. Lindsay—Mr. Lindsay were the instructions we had.

Q. From whom?

A. From both of them.

F. Jondro being again recalled testified that Norton went with him to the South Omaha Lumber Company, at the time this lumber was purchased; we were both to-gether; Norton consented to the purchase of the bill of lumber at that place. Witness's attention being called to the testimony of Mr. Lindsay on the part of the defense, he stated that he signed his name to the bills as O. K.-ing them.

The plaintiff having rested its case, M. S. Lindsay was sworn and examined for the defendants. He testified that his contract that he made was with a man named Noel Nor-ton; that he had been occupying one of defendant's houses in South Omaha until he was largely indebted to him in the way of rent; he was a mason and a plasterer by trade and defendant had just purchased this old building of Mr. Wall and wanted it moved onto that lot where it now stands; wanted a basement put under it and an addition of twenty feet on the end of the building; Norton had been

lying sick with a broken leg and had not been able to do
anything until spring, and he said he could take charge of
the job, secure the removal of the building, put the base-
ment under and put on the addition.   That they talked
the matter over and Norton said it could be done for
$1,200; defendant told him if he could do it for $1,200
he could go ahead and do the job; he then came back to
defendant and said there was a carpenter down there whom
he could get to do the carpenter work, and whom he thought
a good straight man.   Defendant said he could take
charge of the work and employ this carpenter and they
could make out their bills and send them in to him and
defendant would pay them; that Mr. Norton brought up
Jondro, the first time defendant had ever met him, and in-
troduced him to defendant; they then went to work and
as defendant expressed it, "everything was going on nicely
until one day Norton came into the office and said he had
taken some lumber to build a shanty over on some other
lot for himself to live in and he would measure up the
amount of lumber that went into that shanty and defend-
ant could take it out of the contract price."   That up to
this time defendant had never recognized any one in this
matter except Norton, and had paid no checks or paid any
money whatever only through Norton's order or direction
to defendant; that he had settled the labor and work up
to this date; that when the defendant found the funds were
being misappropriated and lumber being misappropriated,
he sat down upon the whole thing and required the bills to
be made out and brought to him before he would pay any;
that this lumber company made out their bill and sent it
up there, but defendant refused to pay it because he had
reason to believe that the lumber did not go into his build-
ing; that he offered to pay them for whatever there was
in the building; that the first he knew about this bill or of
the lumber having been bought from this company, some
agent of the company brought the bill to him; that he

never authorized anybody and never does authorize anybody to buy material on his account, unless it is by special agreement between the parties and on his written order; that Mr. Norton had authority to put that building up and put the improvements there for $1,200; that was the agreement he made with him. There was a verbal contract between defendant and Norton; that every time Norton came to defendant with an estimate, I says, "Now you must hold that contract down within the agreed price;" that this was because defendant found that the money he had been paying was not applied on the bills; Norton was using it for his own expenses or something and it didn't reach the proper parties, so defendant refused to even honor his orders; that he didn't know where Norton lives now or where he is, but he was living in South Omaha the last defendant knew of him; that he never got any compensation in any way for the lumber Norton used in the construction of the building there for himself; that he knows Norton did use it and saw the building he put up, and he offered to go over with defendant and measure it up, and have it charged to him on account.

Defendant also testified that he had been engaged in building houses and putting up structures of the kind of the one under consideration for over three years in the city of Omaha; thinks he has sufficient knowledge to be able to say about how much lumber it would take to put up that kind of a building, as he has put up something over a hundred houses. That he had never refused to pay them for what lumber went into that building; had been ready and willing to pay them for what went into it; that there was never any bill presented to him for lumber for that building outside of the lumber bill of this South Omaha Lumber Company; that he had paid all the bills that had been presented to him outside of this one. Didn't think that among the bills he paid there was any bill for lumber; that there may have been some little material gotten some-

where else; that there is no claim or lien for lumber against these premises outside of the one in suit; that the size of the ground upon which this building was erected is 40x75 feet and that this building occupies the east twenty feet; that the condition of the ground and its elevation with reference to the surrounding soil, is that the lot is brought down to the grade of the street known as Railway alley, and in bringing it down to grade they had to cut something like fifteen or twenty feet on the back of the lot. The front of the lot is ten feet. · This building is located and built right up on the side of that cut on the edge of the lot. The street would be on the north of the building; that they came in at that time either across the east end or on the north lot adjoining on the north side, and delivered the lumber on the adjoining lot. To the question, " Was the entrance through this lot in such condition, at that time during the delivery of this lumber, that a team could haul an ordinary load on that ground?" defendant answered : " It couldn't in a rainy time. I don't know what the condition of the weather was; I wasn't here all the time;" that he don't think that any lumber was hauled in there through that direction on that ground, because it was easier to go through the adjoining lot. Witness thinks all of the framing and cutting up of the lumber was done on the lot adjoining, because the brickwork of the house would bring it up about on a level with the ground.

On cross-examination defendant stated that he guesses he was down there during the building once or twice; that he didn't know who was furnishing the lumber until he saw the bill; didn't know anything about it at all until the bill was presented; that he never asked the contractor where he was getting it from.

The appellant (the Central Investment Company) made two points:

First—There is no proof that Milon S. Lindsay or his wife, or this appellant, was the owner of the real estate

subjected to the lien at any of the times mentioned in the petition.

Second—The lien is excessive to an extent without evidence for its support.

There is returned with the record two affidavits, one made by Howard H. Baldrige, one of the attorneys of the South Omaha Lumber Company, plaintiff, in which he alleges that some time prior to the trial of the above action, he had a conversation with William Healey, attorney for defendant, and that he said to Healey, "I don't suppose you will require us at the trial of that South Omaha lumber (meaning the above case against Milon Lindsay), to prove the title in the property to be in Mr. Lindsay?" to which said Healey responded, "Oh no, I guess not." And this affiant further says that upon the opening of the said trial, he said to Mr. Healey in open court, "I believe you admit the title to have been in Mr. Lindsay, and to now be in the Central Investment Company, (meaning the title to the property against which it was sought to foreclose the mechanic's lien then in dispute), to which Mr. Healey replied, " We make no point on that," and that this affiant then said to the court, "It is admitted that the title to the property in dispute was in Milon S. Lindsay at the time the lien was filed, but is now in the Central Investment Company," which said remark was made in Mr. Healey's presence, and while he was sitting at the counsel table, and which this affiant believes he heard, and said Healey said nothing and made no objection to the remark of this affiant; and this affiant supposed it to be in the records of the case." The other affidavit was by William Healey, attorney for the defendants, in which said deponent denies that he ever at any time told said Baldrige that he, deponent, would not require the plaintiff to prove title in said Lindsay, and denies that he ever entered into any agreement or understanding with said Baldrige, in reference to any proof of title in said Lindsay, or anybody else, in reference to any matter in con-

troversy in said action. Further, that he was present in court during all the time of said trial, and that the deponent did not in any way make any admission as to the said title being in any of the defendants at any time, and did not say anything in reference to any admission of any title during the said trial, and that deponent denies that he said the words of admission or any statement of admission of title was uttered in court, but deponent admitted that he, deponent, did agree with said Baldridge before said trial was entered into, that he, deponent, would enter the appearance of said Central Investment Company and waive everything which would entitle said investment company to a continuance; which said agreement, on the part of the deponent, was fully carried out.

As to these affidavits, the writer is unable to see upon what rule of law or practice counsel attached them to the record, nor does he see that this court can give them any further attention, and they are simply referred to out of respect to counsel.

There is a direct allegation in the petition, "That the defendant Milon S. Lindsay, at the time the plaintiff furnished said lumber and building material, was the owner in fee of said premises, and his wife, Emma A. Lindsay, had a dower interest therein."

Had the defendants, the Lindsays, desired to disclaim any interest in the premises or the subject of the controversy and lien, I think it would have been incumbent upon them to have done something more than to make a general denial. And as to the Central Investment Company, it will be observed by reference to its petition, under and by virtue of which it was admitted as a defendant in this action, that it alleges that the defendants Milon S. Lindsay and Emma A. Lindsay sold and conveyed to said Central Investment Company, upon July 1, 1889, all their right, title, and interest in and to said real estate. This allegation, being of record in the case, estops the Central Investment Company to

deny or question the fact that at the date therein mentioned, which was not only after the filing of the plaintiff's lien, but long after the commencement of this action, the title to the. lot in question was in the Lindsays. The defendants Milon S. Lindsay and Emma A. Lindsay neither of them appeal. A careful examination of the evidence fails to show that the judgment is excessive. It is therefore

AFFIRMED.

THE other judges concur.